UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

SIMON KNIGHT                                    CIVIL ACTION

V.                                              NO. 14-2307

HENDERSON INTERNATIONAL                         SECTION "F"
TECHNOLOGIES INC., ET AL.

<u>ORDER AND REASONS</u>

Before the Court are two motions for summary judgment: one brought by defendant Atlas Copco Compressors, LLC, individually and on behalf of Henderson International Technologies, Inc.; and the other brought by Servomex Company, Inc. Both motions seek summary relief on the plaintiff, Simon Knight's, claims under the Louisiana Products Liability Act. For the following reasons, Atlas' motion is GRANTED as to the plaintiff's negligence claim and DENIED as to the plaintiff's claims under the LPLA. Servomex's motion is GRANTED.

**Background**

This personal injury action arises from an explosion of a helium compressor that caused a flying object to pierce a hole through the plaintiff's ankle.

Knight initially brought suit against numerous defendants who manufactured and serviced the compressor and its component parts. Two defendants remain: Atlas Copco Compressors, LLC (sometimes referred to as Henderson) and Servomex Company, Inc. Both move for

1

summary judgment urging that the plaintiff's claims under the Louisiana Products Liability Act fail as a matter of law.

The accident occurred while the plaintiff, Simon Knight, was working for AirGas Inc. at a compressor station near Houma, Louisiana. Knight was responsible for filling cylinders with various gases. While Knight was performing his duties, a large compressor in the AirGas facility exploded sending a piece of shrapnel through his ankle. Knight has undergone extensive surgeries including a fusion of his ankle. He has, however, been able to return to employment.

AirGas owned the compressor that exploded. Henderson, however, manufactured it. Henderson delivered the compressor to an AirGas facility in Ohio. Sometime later, AirGas disassembled the compressor and moved it to its facility in Houma, Louisiana, where AirGas reassembled it. Henderson contends that AirGas disassembled and reassembled the compressor without consulting or informing Henderson.

In 2009, AirGas contacted Henderson about using the compressor for blended gases. Henderson initially sold the compressor to AirGas for use with pure helium; however, AirGas wanted to use it to compress heliox, a mixture of helium and oxygen. Henderson consulted with AirGas to make necessary modifications to the compressor and to determine the maximum ratio of oxygen for safe operation.

In order to produce heliox, AirGas needed a blending unit in addition to the compressor. The blending unit is a complex machine with multiple layers of equipment. Two components of the blending machine are pertinent here. The first component is an oxygen purity analyzer designed and manufactured by Servomex. The analyzer measures the ratio of oxygen in the gas blend. The second component is a static blender. The static blender consists of a panel with two knobs which are operated and monitored by an AirGas employee called a pumper. The knobs adjust the volumes of oxygen and helium to be mixed. A computer screen displays various gauges and information, including the ratio of oxygen determined by the Servomex analyzer.

The compressor had a maximum oxygen tolerance of 18 percent. If the oxygen level exceeded 18 percent, the Servomex device was designed to automatically shut down the compressor. Nearly a month before the explosion, AirGas sent the analyzer to Servomex for repair. According to the AirGas pumper, Robert Adams, the analyzer reading was not displaying correctly on the computer screen. AirGas employees detached the analyzer and sent it to Servomex. Upon return days later, AirGas employees reinstalled the analyzer. After the explosion, some AirGas employees stated in depositions that they believed the input and output wires were reversed on the Servomex analyzer causing the blending unit to read the percentages of oxygen backwards. The plaintiff submits photos of the wires

3

that show the wire labeled as number 1 is connected to port number 2, and vice-versa. The plaintiff believes this may have caused the explosion.

Notably, it was AirGas who designed the blending unit. Derek Camp, an AirGas engineer and corporate representative, wrote the operator's manual for the blending unit. Camp trained AirGas employees on how to use the blending unit. He performed startup testing and made modifications to the blending unit and the compressor. Henderson contends that it was not consulted during any part of this process.

Both Henderson and Servomex submit that the plaintiff has failed to establish sufficient evidence to show that either was responsible for the explosion. Henderson contends that the cause of the explosion was twofold: the crossed wires of the Servomex analyzer and/or operator error by AirGas' pumper, Robert Adams. Servomex urges that the AirGas employees' statements claiming the analyzer's wires were reversed are inadmissible hearsay. Servomex contends that there has been no substantial inspection of its device that links it to the cause of the accident. For these reasons, the defendants seek summary dismissal of the plaintiff's claims.

I.

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine dispute as

to any material fact such that the moving party is entitled to judgment as a matter of law. No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio., 475 U.S. 574, 586 (1986). A genuine dispute of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. See id. Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. Id. at 249-50 (citations omitted). Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5 Cir. 1992). Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claim. Id. Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible at trial do not qualify as competent opposing evidence. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5 Cir. 1987); Fed. R. Civ. P. 56(c)(2).

5

Finally, in evaluating the summary judgment motion, the Court must read the facts in the light most favorable to the non-moving party. Anderson, 477 U.S. at 255.

II.

The plaintiff's claims against both defendants arise under the Louisiana Products Liability Act. The LPLA establishes the "exclusive theories of liability for manufacturers for damage caused by their products." La. R.S. § 9:2800.52. "Manufacturer" is defined broadly to include one who influences the design of a product or incorporates into the product a component part manufactured by another manufacturer. La. R.S. § 9:2800.53. The plaintiff has the burden of proof to show: 1) the defendants are manufacturers of products; 2) a characteristic of their products proximately caused his injury; 3) the injury arose from a reasonably anticipated use of the product; and 4) the characteristic that caused his injuries was "unreasonably dangerous." See La. R.S. § 9:2800.54.

There are only four ways in which a plaintiff can show that a product was "unreasonably dangerous." He must show either that it was unreasonably dangerous: 1) in construction or composition; 2) in design; 3) due to an inadequate warning; or 4) due to breach of an express warranty. See La. R.S. § 9:2800.54(B). The meaning of "unreasonably dangerous" differs slightly in the context of each theory of liability.

6

A product is unreasonably dangerous in construction or composition if, at the time it leaves the manufacturer's control, it deviates in a material way from the manufacturer's specifications for otherwise identical products. See La. R.S. § 9:2800.55. A product is unreasonably dangerous in design if, at the time it leaves the manufacturer's control, there exists an alternative design for the product capable of preventing the injury and such alternative would not be over burdensome on the manufacturer. See La. R.S. § 9:2800.56. A product is unreasonably dangerous due to an inadequate warning if the product possesses a characteristic that may cause damage and the manufacturer fails to use reasonable care to provide adequate warning of such characteristic. See La. R.S. § 9:2800.57. A product is unreasonably dangerous for failing to comply with an express warranty if the warranty induced the plaintiff to use the product and the untruthfulness of the warranty was the proximate cause of his injuries. See La. R.S. § 9:2800.58. The plaintiff sues both defendants under all four theories.

III.

Henderson claims that the plaintiff has failed to carry his burden to produce evidence showing how the compressor was unreasonably dangerous or the proximate cause of his injuries. In support, Henderson relies on testimony of AirGas employees who claim that the input and output wires were reversed on the Servomex

analyzer. Additionally, Henderson contends that the pumper, Robert Adams, who was operating the blending unit at the time of the explosion was inexperienced. Adams admitted in deposition testimony that he had never read the operator's manual for the compressor and was unaware of periodic maintenance requirements. Adams also stated that he was unfamiliar with how the equipment worked. Henderson asserts that the only two plausible explanations for the explosion are operator error and/or the reversal of the wires on the Servomex analyzer.

The plaintiff submits that, shortly after the blending unit came online, the compressor began emitting loud and unusual noises. AirGas contacted Henderson and Henderson sent a representative, Ron Norton, to address the problem. Norton determined that he needed to lengthen the springs for the valves on the fourth and fifth stages of the compressor. Derek Camp, the AirGas engineer and corporate representative, testified that he relied on Henderson to fix the problems with the compressor. The plaintiff's experts have determined that the fourth and fifth stages of the compressor caused the explosion. The plaintiff faults Norton's repairs.

Additionally, the plaintiff points to emails between Henderson employees and a third party in which they discussed the possible corrosive effect on the valves of the AirGas compressor due to the introduction of oxygen. The plaintiff submits that

8

Henderson knew of the potential for corrosion and failed to warn AirGas despite many opportunities to do so. The plaintiff contends that AirGas relied on Henderson's representations that the compressor could be used for blended gas containing oxygen. According to the plaintiff, Henderson never communicated its knowledge of oxygen's potential corrosive effects on the valves.

Moreover, the plaintiff's expert metallurgist, Dr. Tom Shelton, found after performing destructive testing that the fourth and fifth stage inlet and outlet valves on the compressor were eroded and leaking at the time of the incident. He opined further that the "material used to fabricate the check valves was not suitable for the environment, pressure, temperature, and flow rates experienced in the fourth and fifth stage cylinders." He advised that alternative metals would have been more suitable under the conditions in which the compressor was being used.

In short, the record is rampant with substantial issues of material fact. For example, it is unclear whether the repairs made to the compressor by Henderson's employee contributed to the explosion. It is also uncertain as to when Henderson knew of the corrosive effects of introducing oxygen to the compressor and whether it communicated that knowledge to AirGas. Equally unclear is whether the compressor was designed with materials to adequately withstand the introduction of oxygen, and whether corrosion played a role in causing the explosion. Such factual determinations must

be made by the jury. Atlas Copco's motion for summary judgment is denied.[1]

### IV.

Servomex, however, submits that the plaintiff has failed to produce any competent evidence to show how a characteristic of the Servomex device caused the explosion or was unreasonably dangerous. It contends that the AirGas employees' deposition testimony claiming that the connections on the Servomex machine were somehow reversed is inadmissible hearsay. The plaintiff stated in his deposition that he was told by the pumper, Robert Adams, that the connections, or modules, on the Servomex device were backwards. In turn, Adams testified that Derek Camp told him that the wires on the analyzer were mislabeled. Similarly, another AirGas witness, B.G. Colley, testified that Derek Camp told him that the inlet and outlet monitoring connections had been switched on the Servomex analyzer. So, clearly, someone told someone who told someone. All of this testimony is classic hearsay based on the alleged statements of Derek Camp.

When questioned about his colleague's testimony, Derek Camp did not recall any conversations with Adams or Colley about the Servomex modules being switched. Indeed, when asked whether he thought that switching the modules would have an effect on the

---

[1] Both sides in this dispute seem to have a substantial litigation risk of success.

system, Camp stated, "If you switch the modules – you have a sample 1, sample 2. Sample 1 was being taken from the inlet of the compressor, sample 2 from the outlet. Sample 1 was the sample that was to secure the oxygen supply, close that valve. So if sample 2 were switched with 1, it should not have had any effect at all because those are both zeroed and spanned identically." Further, Camp denied ever investigating whether the modules on the Servomex device had been switched.

The plaintiff's theory of liability is that the wires attached to the Servomex device are reversed in the photographs because Servomex improperly switched the modules on the back of the analyzer while conducting repairs. Allegedly, reversing the wires was necessary because the modules were reversed. But this theory rests entirely on Colley and Adams' indirect testimony that Derek Camp told them that the modules had been switched. Camp does not recall making those statements, and he denies ever reversing the wires. To the contrary, he testified that the modules on the Servomex device were "zeroed and spanned identically," and that switching the modules would have no effect on the system.

Servomex offers an affidavit of its supervisor, Nathan Gomez, who oversaw the repairs of the analyzer. Gomez stated with first-hand knowledge that the "two oxygen purity transducers in the Servomex Analyzer are identical in their manufacture and function." Moreover, he claimed, "The oxygen measuring cells were

replaced – not switched – with new oxygen measuring cells, and the oxygen purity transducers were not moved and none of the internal wiring or tubing was altered during the service on September 11, 2013." The plaintiff responds with mere speculation.

Absent the hearsay testimony of Adams and Colley, the plaintiff has no admissible competent evidence. First, he has the photos showing that the wires on the Servomex device were reversed. Yet, the plaintiff admits that AirGas employee B.G. Colley reinstalled the Servomex device after it was repaired. It is undisputed that Colley reattached the wires that are depicted in the photograph. Accordingly, if the wires were reversed, it was not the fault of Servomex.

The plaintiff's remaining evidence consists of expert reports speculating that an introduction of oxygen to the system *might* have caused the explosion. The plaintiff's expert engineer, Fred Liebkemann, found that reversing the wires "might result in out of tolerance blended gas being sent to fill rather than vent, but only during transient conditions (while the operator is balancing the flows by adjusting the regulators)." Adams testified, however, that he was looking at the display screen at the time of the explosion, not adjusting the regulators on the static blender.

Finally, the plaintiff submits an untimely supplemental brief in which he offers a new expert report finding that the reversed wires, again might have caused the explosion. Absent any evidence

of an unreasonably dangerous characteristic in Servomex's product, however, this speculative finding does not attach liability to Servomex.

The plaintiff's only remaining contention is that the Servomex device was never repaired properly, and the same defect that existed when AirGas returned the analyzer to Servomex caused the explosion. Again, the plaintiff offers no competent evidence to support his theory. The plaintiff submits that the pumper, Robert Adams, was "waiting for the Servomex unit to stabilize" at the time of the explosion. He contends that the failure of the Servomex unit to stabilize "is the precise issue identified by Servomex when the unit was repaired on September 11, 2013." But that account, however, is inconsistent with Adams' own testimony.

Adams stated that nothing out of the ordinary occurred before the explosion. When asked if he was concerned that something was wrong before the explosion, Adams stated, "No, Sir." The only testimony suggesting Adams was "waiting for the Servomex unit to stabilize" was given by Rebecca Daigle. Daigle was not onsite at the time of the explosion, and her testimony is based entirely on what she recalls Adams telling her. Once again, rank hearsay.

All of the plaintiff's theories of liability under the LPLA are grounded on the premise that Servomex improperly switched the modules on the analyzer. In support, however, the plaintiff offers only speculation and hearsay. Hearsay evidence and unsworn

13

documents that cannot be presented in a form that would be admissible at trial do not qualify as competent opposing evidence. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5 Cir. 1987); Fed. R. Civ. P. 56(c)(2).

Moreover, none of the plaintiff's experts - or anyone else - have performed the necessary testing or analysis on the Servomex device to acquire competent evidence to prove that the modules were switched. Summary relief is proper if the party opposing the motion fails to establish an essential element of his case. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). On this record, the plaintiff fails to show how any characteristic of the Servomex device was unreasonably dangerous or the proximate cause of his injuries. Servomex's motion for summary judgment is granted.

V.

In addition to his claims under the LPLA, the plaintiff asserts negligence claims against both defendants. It is well settled that the LPLA establishes the "exclusive theories of liability for manufacturers for damage caused by their products." La. R.S. § 9:2800.52. Negligence is not a theory permitted by the LPLA. Stahl v. Novartis Pharmaceuticals Corp., 283 F.3d 254, 261 (5th Cir. 2002)("[F]or causes of action arising after the effective date of the LPLA, negligence, strict liability, and breach of express warranty are not available as theories of recovery against

a manufacturer, independent from the LPLA."). Thus, the plaintiff's negligence claims are dismissed.

Accordingly, IT IS ORDERED that Atlas Copco's motion for summary judgment is GRANTED as to the plaintiff's negligence claim and DENIED as to the plaintiff's claims under the LPLA.

IT IS FURTHER ORDERED that Servomex's motion for summary judgment is GRANTED. The plaintiff's claims against Servomex are DISMISSED WITH PREJUDICE.

New Orleans, Louisiana, March 16, 2016

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE